MICHAEL HEALY (SBN 95098)
mhealy@shb.com
M. KEVIN UNDERHILL (Bar No. 208211)
kunderhill@shb.com
EMILY M. WEISSENBERGER (Bar No. 248898)
eweissenberger@shb.com
**SHOOK, HARDY & BACON L.L.P.**
555 Mission Street, Suite 2300
San Francisco, CA 94105
Tel: (415) 544-1900 | Fax: (415) 391-0281

Attorneys for Defendant
PERRIGO COMPANY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| VISHAL SHAH, individually and on behalf of all others similarly situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>PERRIGO COMPANY,<br><br>        Defendant. | Case No. 8:22-CV-02006-JWH-DFM<br><br>**DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS**<br><br>Date:     February 24, 2023<br>Time:    9:00 a.m.<br>Dept.:   9D |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

FACTS ......................................................................................................................2

ARGUMENT .............................................................................................................6

I.     Plaintiff's claims are expressly preempted by federal law.............................6

     A.     If successful, these state-law claims would impose requirements
           different from and in addition to what federal law requires. ...............7

     B.     Plaintiff's attempt to disclaim additional warning requirements is a
           distinction without a difference here.....................................................9

II.    Plaintiff has not pleaded facts sufficient to plausibly allege DXM causes
     drowsiness. ...................................................................................................12

III.   Plaintiff's express-warranty claim fails because he failed to provide
     adequate presuit notice of his claim as the Commercial Code requires........15

IV.    Plaintiff's claims for equitable relief should be dismissed because he has
     not alleged facts showing he would lack an adequate legal remedy.............16

CONCLUSION.........................................................................................................17

DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Aloudi v. Intramedic Rsch. Grp., LLC*,
   729 F. App'x 514 (9th Cir. 2017)..................................................................12

*Alvarez v. Chevron Corp.*,
   656 F.3d 925 (9th Cir. 2011) .......................................................................15

*Amara v. Publix Supermarkets, Inc.*,
   No. 8:22-cv-367-VMC-JSS, 2022 WL 3357575 (M.D. Fla. Aug. 15,
   2022) ................................................................................................8, 9, 10, 11

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)..................................................................................6, 12

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)...........................................................................................6

*Bimont v. Unilever U.S., Inc.*,
   No. 14-CV-7749, 2015 WL 5256988 (S.D.N.Y. Sept. 9, 2015) ............................11

*Carter v. Novartis Consumer Health*,
   582 F. Supp. 2d 1271 (C.D. Cal. 2008) ..................................................11

*Davidson v. Kimberly-Clark Corp.*,
   889 F.3d 956 (9th Cir. 2018) ......................................................................17

*Durnford v. MusclePharm Corp.*,
   907 F.3d 595 (9th Cir. 2018) .........................................................................6

*Dutra v. J.R. Simplot Co.*,
   2023 WL 113846 (E.D. Cal. Jan. 5, 2023) ...........................................16

*Eckler v. Wal-Mart Stores, Inc.*,
   No. 12-CV-727-LAB, 2012 WL 5382218 (S.D. Cal. Nov. 1, 2012) ...............13, 14

*Faustino v. Alcon Lab'ys, Inc.*,
   2015 WL 12839161 (C.D. Cal. Sept. 22, 2015), *aff'd* 692 F. App'x
   819 (9th Cir. 2017) ......................................................................................11

*Goldstein v. Walmart, Inc.*,
   No. 22-cv-00088 (LJL), 2022 WL 16540837 (S.D.N.Y. Oct. 28, 2022)..8, 9, 10, 11

DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS

*Guzman v. Polaris Indus., Inc.*,
   49 F.4th 1308 (9th Cir. 2022) ................................................................ 16

*Hanscom v. Reynolds Consumer Prod. LLC*,
   No. 21-CV-03434-JSW, 2022 WL 591466 (N.D. Cal. Jan. 21, 2022) ................... 16

*Harris v. Topco Assocs., LLC*,
   538 F. Supp. 3d 826 (N.D. Ill. 2021) ......................................................... 11

*Kanter v. Warner-Lambert Co.*,
   99 Cal. App. 4th 780 (2002) ..................................................................... 2

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................... 4

*Klaehn v. Cali Bamboo LLC*,
   No. 21-55738, 2022 WL 1830685 (9th Cir. June 3, 2022) .................................. 16

*Kwan v. SanMedica Int'l*,
   854 F.3d 1088 (9th Cir. 2017) ................................................................... 12

*Lemus v. Rite Aid Corp.*,
   No. SA CV 22-00253-DOC, 2022 WL 2721385 (C.D. Cal. July 7,
   2022) ................................................................................................... 10

*Martinez v. Mead Johnson & Co., LLC*,
   No. 5:22-cv-00213-JWH, 2022 WL 15053334 (C.D. Cal. Oct. 22,
   2022) .............................................................................................. 4, 17

*McKinney v. Corsair Gaming, Inc.*,
   No. 22-cv-00312-CRB, 2022 WL 2820097 (N.D. Cal. July 19, 2022) .................. 16

*Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*,
   710 F.3d 71 (2d Cir. 2013) ........................................................................ 2

*Norman v. Gerber Prods. Co*,
   No. 21-cv-09940-JSW, 2023 WL 122910 (N.D. Cal. Jan. 6, 2023) ...................... 16

*Otto v. Abbott Laboratories, Inc.*,
   No. CV 12-1411-SVW, 2013 WL 12132064 (C.D. Cal. Mar. 15,
   2013) ............................................................................................. 12, 14

*Robinson v. Walgreen Co.*,
   No. 20 C 50288, 2022 WL 204360 (N.D. Ill. Jan. 24, 2022) .............................. 11

DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) ................................................................ 16

*Stewart v. Kodiak Cakes, LLC*,
   537 F. Supp. 3d 1103 (S.D. Cal. 2021) ................................................ 17

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)............................................................................. 16

*Tubbs v. AdvoCare Int'l, L.P.*,
   No. CV 17-4454 PSG, 2017 WL 11630768 (C.D. Cal. Dec. 12, 2017) .......... 12, 14

*Wiltz v. Chattem, Inc.*,
   2015 WL 3862368 (C.D. Cal. May 8, 2015)........................................ 11

*Youngblood v. CVS Pharmacy*,
   No. 2:20-cv-06251-MCS-MRW, 2021 WL 3700256 (C.D. Cal. Aug.
   17, 2021) ........................................................................................ 6, 11

**Statutes**

21 U.S.C. § 379r(a) ................................................................................ 6, 10

Cal. Com. Code § 2607............................................................................ 15

**Rules**

Fed. R. Civ. P. 8(a) ................................................................................. 1, 6

**Other Authorities**

21 C.F.R. § 314.126................................................................................. 13

21 C.F.R. § 330.1 ....................................................................................... 2

21 C.F.R. § 330.10(a) ................................................................................. 2

21 C.F.R. §§ 341.72 ................................................................................... 4

21 C.F.R. §§ 341.74 ............................................................................... 4, 7

37 Fed. Reg. 85 (Jan. 5, 1972)................................................................... 2

41 Fed. Reg. 38312 (Sept. 9, 1976) ....................................................... 2, 7

44 Fed. Reg. 51512 (Aug. 31, 1979) ................................................... 13, 14

iv

48 Fed. Reg. 48576 (Oct. 19, 1983) .......................................................... 3, 4, 7

52 Fed. Reg. 30042, 1987 WL 138970 (Aug. 12, 1987) .................................................. 2

DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS

**INTRODUCTION**

Plaintiff alleges he was misled by the term "Non-Drowsy" on the label of an over-the-counter cough medicine that contained dextromethorphan hydrobromide (DXM). Plaintiff claims DXM may in fact cause drowsiness. But the Food and Drug Administration found no data to support that claim, and it approved DXM for use as safe, effective, and not misbranded, without imposing any requirements regarding drowsiness. For several reasons, the Court should dismiss Plaintiff's complaint.

First, federal law expressly preempts Plaintiff's claims. The FDA specifically addressed the potential side effects—including drowsiness—of all the active ingredients proposed for use in cough suppressants. It then imposed requirements on some products and not others, depending on whether the data showed this risk was material. This is why such products have been sold for decades in "Nighttime" and "Daytime" (or "nondrowsy") forms. Plaintiff thinks the FDA made a mistake, and wants to use state law to put DXM in a different category with different requirements. But federal law preempts any state attempt to impose requirements that are different from, in addition to, or otherwise not identical with federal requirements. Because Plaintiff's claims seek to do just that, they are expressly preempted.

Second, Plaintiff has not alleged facts that make his claims about DXM plausible, as Rule 8 requires. Though he claims the risk of drowsiness is not just material, but "common" and even potentially dangerous, he has cited no scientific evidence that actually supports this.

Third, Plaintiff's express-warranty claim fails because the Commercial Code requires adequate notice in advance of filing suit. Four days (or less) is not adequate.

Finally, Plaintiff's equitable claims also fail because he has alleged no facts showing he lacks an adequate remedy at law or is entitled to injunctive relief. Even if DXM were likely to cause drowsiness, Plaintiff cannot plausibly claim he would be misled in the future by a label claiming otherwise, given what he now says he knows. For that reason too, the Court should grant Perrigo's motion.

1

# FACTS

- **Federal regulation of over-the-counter (OTC) drug products generally**

The FDA regulates OTC cough, cold, and flu products through a process that determines the conditions under which a category of OTC drugs or a specific drug will be considered "safe and effective and not misbranded," called a monograph. *See* 21 C.F.R. § 330.1; *see generally Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 75 (2d Cir. 2013) (describing monograph process); *Kanter v. Warner-Lambert Co.*, 99 Cal. App. 4th 780, 795 (2002) (same). This process is comprehensive. First, the FDA appoints an advisory review panel that analyzes available data regarding the safety and effectiveness of the drugs the FDA is proposing to regulate. 21 C.F.R. § 330.10(a). Second, the FDA publishes a proposed monograph for public comment based on the panel's findings. Third, it publishes an updated "tentative final monograph" for additional public comment. *Id.* § 310.10(a)(7). After reviewing any objections, the entire administrative record, and the arguments made at hearings, FDA publishes a final monograph. *Id.* § 310.10(a)(9).

- **Federal regulation of cough and cold medicine**

Over 30 years ago, FDA issued the final monograph governing OTC cold and flu medicines (and similar products). Cold, Cough, Allergy, Bronchodilator, and Antiasthmatic Drug Products for Over-the-Counter Human Use; Final Monograph for OTC Antitussive Drug Products, 52 Fed. Reg. 30042, 1987 WL 138970 (Aug. 12, 1987) (codified in 21 C.F.R. Part 341). This monograph was 15 years in the making. *See* 37 Fed. Reg. 85 (Jan. 5, 1972) (announcing proposed rulemaking).

The advisory review panel spent years "thoroughly review[ing] the literature" and considering other data and testimony regarding numerous products and active ingredients. *See* 41 Fed. Reg. 38312, 38314–15, 38319 (Sept. 9, 1976) (discussing the panel's report). As one would expect, the expert panel carefully considered "information related to adverse effects in humans, both adults and children,"

DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS

specifically including the potential risk of drowsiness. *Id.* at 38335. It recommended imposing requirements with regard to some active ingredients, but not others:

- For example, the panel considered reports that some antihistamines caused drowsiness, the question whether adding caffeine might eliminate this risk, and whether warnings should be required. 41 Fed. Reg. at 38312, 38324, 38325, 38329. It found that products containing certain antihistamines should bear the warning "may cause drowsiness." *Id.* at 38324.

- It also considered concerns that the active ingredients in cough suppressants might cause drowsiness. *See id.* at 38338–38352. For one such ingredient, diphenhydramine HCl, it concluded the risk was sufficient to require the warning "may cause marked drowsiness." *Id.* at 38340–41.

- For others, including codeine, it concluded that despite some reports of drowsiness, the risk was not material and so no warning should be required. *See id.* at 38339; *see also id.* at 38345 (noting reports of drowsiness associated with caramiphen edisylate); 38352 (same for noscapine HCl).

- For DXM, the panel also considered potential side effects, including even rare events "such as occur in drug abuse or accidental poisoning," involving doses many times higher than recommended. *Id.* As with codeine, it did not recommend drowsiness warnings for DXM. *Id.* at 38340.

The potential risk of drowsiness was also considered in connection with the tentative final monograph. 48 Fed. Reg. 48576 (Oct. 19, 1983). There, the FDA responded to a comment asking it to take a "careful look" at the possible side effects on children of some active ingredients, "especially dextromethorphan," by reviewing adverse-reaction reports for 1969 through 1981. *Id.* at 48581. It found only 15 reports of adverse reactions in children during that 12-year period. *Id.* If any of those reports involved drowsiness, the FDA did not mention it. Also, the FDA responded to concerns about diphenhydramine HCl, which studies had allegedly shown could cause "an unacceptable level of drowsiness," but did not change its position that the product was safe if sold with the required warning. *Id.* at 48581–82.

The tentative monograph also addressed whether labels could claim that cough medications could help a person sleep. 48 Fed. Reg. at 48589. The FDA found this was reasonable if it related only to aiding sleep by suppressing the cough itself, but

3

that it would be misleading to claim a product would aid sleep directly in the absence of any data to support the claim. *Id*. It found this was the case with regard to both codeine and DXM. *Id.* Specifically, it noted that the panel found "the drowsiness caused by a 20-mg oral dose of codeine ... is not significantly greater than that of a placebo," and did not even mention drowsiness when discussing DXM. *Id.* (citing 41 Fed. Reg. 38339–40). Because the FDA was **"not aware of data demonstrating that ... codeine and [DXM] could be classified as ... nighttime sleep-aids or that they require a drowsiness warning,"** it made no changes. *Id.* (emphasis added).

The final monograph addressed warnings again, but again made no changes. 52 Fed. Reg. 30042 at 30047–48. The FDA's conclusions were codified at 21 C.F.R. Part 341. Products containing some antihistamines or the antitussive diphenhydramine HCl must warn that they "may cause marked drowsiness." *See, e.g.*, 21 C.F.R. §§ 341.72(c)(4), 341.74(c)(4)(viii)–(ix). Products containing certain other antihistamines must warn that they "may cause drowsiness." *Id.* §§ 341.72(c)(3). There is no such requirement for products containing DXM.

- **Plaintiff's Allegations**

Vishal Shah is a California resident. Compl. ¶ 6. He alleges he bought GoodSense "Non-Drowsy Daytime Severe Cold & Flu" from Amazon.com on June 30, 2022. *Id*. ¶ 38. Plaintiff claims he relied on the "non-drowsy" and "daytime" language in the image of the product's packaging. *Id*.; *see* GoodSense Label (Exh. A to Declaration of Emily Weissenberger).[1] He alleges that, sometime after taking the recommended dose of the medication, "he became unexpectedly drowsy," and that there was "no other potential cause for his drowsiness." *Id*. ¶ 38. (There are, of course,

---

[1] All of the exhibits attached to Ms. Weissenberger's declaration are true and correct copies of the full versions of labels or documents referenced in the complaint but not attached to it. Because all are part of the basis for Plaintiff's claims, but he has not provided them (or has provided only a part), the Court may consider them under the doctrine of incorporation by reference. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002–07 (9th Cir. 2018); *Martinez v. Mead Johnson & Co., LLC*, No. 5:22-cv-00213-JWH, 2022 WL 15053334, at *8 (C.D. Cal. Oct. 22, 2022).

many other potential causes for drowsiness.) He does not specify when he took the medication, how long after taking it he experienced drowsiness, what time he experienced drowsiness, or describe what that drowsiness felt like. Nor does he claim the medicine did not help with his cold & flu symptoms. Still, Plaintiff alleges that the risk of drowsiness is so great that the product is "worthless to him." *Id*.

To support his claim, Plaintiff cites only one purportedly scientific study, now more than a quarter-century old. *See* Compl. ¶ 21 & n.6 (citing E. Catena & L. Daffanchio, Efficacy and Tolerability of Levodropropizine in Adult Patients; Comparison with Dextromethorphan, 10 Pulmonary Pharmacology & Therapeutics 89–96 (1997) (Exh. B to Weissenberger Decl.). This study, conducted in Italy, compared the efficacy of two antitussives, DXM and levodropropizine (which has never been approved for use in the United States). *See* Catena Study at 89. The study found that the latter was at least as effective in suppressing coughs as DXM. *Id*. at 95. But as the authors conceded, this study did not involve a control group of patients who received only a placebo. *Id*. They asserted this was unnecessary because they were only comparing two drugs that had each been shown, in studies that *were* placebo-controlled, to be effective cough suppressants. *Id*. But they cited no such studies regarding *drowsiness*, and as discussed in more detail below, for that and other reasons this study cannot support Plaintiff's causation claim.

Plaintiff further asserts that the FDA's adverse-event-report database "confirms" that drowsiness is a frequent side effect of DXM. Compl. ¶ 22. But this database contains only unverified anecdotal reports that, as the FDA itself cautions, cannot even be "used to estimate the incidence (occurrence rates) of the events reported," much less to support an inference of causation. FDA Adverse Event Reporting System Dashboard (visited Dec. 29, 2022).

Plaintiff cites only a handful of other sources, among them a Federal *Aviation* Administration document that, according to Plaintiff, contradicts the FDA's findings about DXM. Compl. ¶ 23. But as shown by the first page of that document, which

refers pilots to the FDA-approved label for concerns about drowsiness, the FAA was not purporting to establish its own independent standards. FAA: What over-the-counter medications can I take and still be safe to fly? (visited Dec. 29, 2022) (Exh. E to Weissenberger Decl.). Plaintiff's remaining citations are to brief (even one-word) references to "drowsiness" on a webpage and in a "safety data sheet" for a different product. *See* Exh. C & D to Weissenberger Decl.

The complaint alleges seven causes of action: breach of express warranty, violation of the UCL, FAL, and CLRA, negligent misrepresentation, unjust enrichment, and common-law fraud.

## LEGAL STANDARD

A complaint must allege facts that set forth a plausible claim for relief. Fed. R. Civ. P. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A claim is plausible "when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663. Legal conclusions alone are insufficient to meet this standard. *Id*. at 678–79.

## ARGUMENT

### I.   Plaintiff's claims are expressly preempted by federal law.

To establish national uniformity for OTC drugs and their labeling, Congress expressly prohibited states from establishing "any requirement ... that is different from or in addition to, or that is otherwise not identical with, a requirement" imposed under federal law. 21 U.S.C. § 379r(a)(2). FDA monographs impose federal requirements that may have preemptive effect. *See, e.g.*, *Youngblood v. CVS Pharmacy*, No. 2:20-cv-06251-MCS-MRW, 2021 WL 3700256, at *2–3 (C.D. Cal. Aug. 17, 2021). Duties imposed as a result of state-law claims are requirements that may be preempted. *See, e.g.*, *Durnford v. MusclePharm Corp.*, 907 F.3d 595, 600–03 (9th Cir. 2018) (holding FDCA preempted claim that "40 grams" statement on front label was misleading).

Here, Plaintiff's claims are preempted because he seeks to impose requirements different from and in addition to those imposed by the FDA regarding drowsiness.

**A.      If successful, these state-law claims would impose requirements different from and in addition to what federal law requires.**

Plaintiff alleges that marketing products with DXM as "non-drowsy" or for "daytime" is misleading because, according to him, DXM poses some unspecified risk of drowsiness. But the FDA and its expert panel reviewed exactly that concern, and after that review they were "aware of no data" showing DXM could aid sleep or that its effects required any drowsiness warning. 48 Fed. Reg. at 48589. The panel discussed the drowsiness concern repeatedly, even when the evidence was weak or equivocal. *See* 41 Fed. Reg. at 38339 (noting studies showed rate of drowsiness for codeine had "not been significantly greater than with placebo"); 38345 & 38352 (noting reports associated with other ingredients). Yet—as the FDA itself later noted—the panel did not even *mention* drowsiness in connection with DXM. 48 Fed. Reg. at 48589 (citing 41 Fed. Reg. 38339–40). As a result, the FDA required drowsiness warnings for some ingredients, including one antitussive (diphenhydramine HCl). But it did not require a warning for DXM, not even the mild "may cause drowsiness." *See* 21 C.F.R. §§ 341.74(b)(3)(vi)–(vii), (c)(4)(v)–(vii), 24 (d)(1)(iii). And again, it not only refused to require a drowsiness warning for DXM or codeine, it stated that manufacturers would not be allowed to market products containing these ingredients as "sleep aids." In short, the FDA did not and does not consider products with these active ingredients to be "drowsy."

As this shows, the reason there are "nighttime" and "daytime" (or "non-drowsy") products is because those are the categories the FDA established. It imposed labeling requirements on products in one category but not the other. Plaintiff contends that the FDA put products with DXM in the wrong category. If he were correct, then manufacturers and sellers of cough suppressants would necessarily be subject to labeling requirements different from and in addition to those put in place by the FDA,

and those requirements would vary from state to state—just what Congress sought to prevent. Their claims are therefore preempted.

Two district courts in other circuits have recently dismissed identical claims for this reason. *Goldstein v. Walmart, Inc.*, No. 22-cv-00088 (LJL), 2022 WL 16540837 (S.D.N.Y. Oct. 28, 2022); *Amara v. Publix Supermarkets, Inc.*, No. 8:22-cv-367-VMC-JSS, 2022 WL 3357575 (M.D. Fla. Aug. 15, 2022). The analysis in *Goldstein* is especially comprehensive. As the court's discussion makes clear, the allegations against Walmart were identical to Plaintiff's allegations here. *Goldstein*, 2022 WL 16540837, at *1–2. The court noted that the FDA monograph "deals squarely with the issue" of potential drowsiness. *Id.* at *10. The FDA required drowsiness warnings for some antitussives, but not DXM. *Id.* Though the FDA required other warnings on products with DXM, such as a warning not to take the product if also taking a "prescription monoamine oxidase inhibitor" (a class of drugs used to treat conditions like depression or Parkinson's disease), it did not require any similar warning related to potential drowsiness. *Id.* And it reached these conclusions despite recognizing the existence of at least some "scientific literature describ[ing a] slight drowsiness as a side effect for both codeine and [DXM]." *Id.* (citing 48 Fed. Reg. at 48589). Because the plaintiffs sought to impose non-identical state requirements with regard to conduct that the FDA had squarely addressed, their claims were expressly preempted. *Id.* (citing, *e.g.*, *Critcher v. L'Oreal USA, Inc.*, 959 F.3d 31, 36 (2d Cir. 2020) (holding preemption applied where "Congress or the FDA could have chosen to mandate such additional labeling …, but they did not.")).

The *Goldstein* court then proceeded to rebut the plaintiffs' counter-arguments, arguments that Plaintiff will also make here. In particular, both *Goldstein* and *Amara* rejected arguments that preemption could not apply because the plaintiffs claimed they were not demanding an additional warning, only the removal of the term "non-drowsy" (or "daytime"). As discussed next, that is a distinction without a difference.

DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS

**B.**     **Plaintiff's attempt to disclaim additional warning requirements is a distinction without a difference here.**

Plaintiff essentially concedes a state could not require Perrigo to add a "may cause drowsiness" warning to a product containing DXM. This is why he insists his claims are limited to the "affirmative" representation on the front of the labels and that he does not seek a warning. The FDA does not require that specific representation, he argues, so nothing precludes a state from requiring it to be removed. That argument might be valid if the FDA had never considered the risk of drowsiness at all. But under the circumstances here, Plaintiff's distinction is one without a difference. *Goldstein*, 2022 WL 16540837, at \*11; *Amara*, 2022 WL 3357575, at \*5.

<u>First</u>, as the court pointed out in *Goldstein*, this argument would allow a plaintiff to avoid preemption simply by recharacterizing an omission claim (failure to disclose that the product is "drowsy") as one for misrepresentation (disclosing the opposite—that the product is "non-drowsy"). *Goldstein*, 2022 WL 16540837, at \*11. This distinction is "notoriously elusive," and regardless of the characterization, on the facts here "the only way for the manufacturer to avoid liability would be to make an additional disclosure on its packaging." *Id*. (citation omitted).

That is especially true here given that there are *two* categories of antitussive products, and the other category *is* required to bear a drowsiness warning. If Perrigo simply removed "non-drowsy" from the front of its products with DXM, that would not solve the problem Plaintiff says exists, because consumers will still encounter cough medicines that they *must* be told "may cause drowsiness." A reasonable consumer would understandably draw the conclusion that the other products (that is, the ones with DXM, and no drowsiness warning) would *not* cause drowsiness. If Plaintiff were right about DXM, then, the only way for Perrigo to avoid liability would be to make some additional disclosure about the potential risk of drowsiness. The labels would then vary from state to state, depending on whether courts or juries agreed with the FDA's findings. That is just what Congress sought to prevent.

9

1    Second, Plaintiff will also argue, as in *Goldstein*, that preemption cannot apply

2    because the FDA has not specifically approved the terms "non-drowsy" or "daytime"

3    for use on the products' front labels. There is no such requirement. *Goldstein*, 2022

4    WL 16540837 at *11. Again, the result might be different if the FDA had never

5    addressed the subject matter of a plaintiff's claim. *See id*. at *9 n.5 (distinguishing

6    *Astiana*, in which the FDA had not addressed definition of "natural"). But if the claim

7    is within the scope of what the FDA did consider, then state-law requirements must be

8    *identical* to the federal result, or else the claim is preempted. That is the case here. *Id*.

9    at *10 (holding preemption applied because "Plaintiff's claim does not fall outside the

10   scope of federal requirements, which would allow the claims to proceed").

11       Plaintiff will note that, before *Goldstein* and *Amara* were decided, Judge Carter

12   agreed with their position that express preemption can never apply unless the FDA has

13   "explicitly authorized" the use of the particular term being challenged. *Lemus v. Rite*

14   *Aid Corp.*, No. SA CV 22-00253-DOC, 2022 WL 2721385, at *9 (C.D. Cal. July 7,

15   2022). Judge Carter has since agreed to consider further briefing on express

16   preemption (and other issues), and his decision on a second motion to dismiss is

17   pending. Respectfully, Perrigo believes that Judge Carter's initial ruling was in error,

18   and that this Court should find the analyses in *Goldstein* and *Amara* more persuasive.

19       First, the narrow view of federal preemption expressed in *Lemus* is contrary to

20   the text of section 379r. If Congress had intended to preempt only claims about

21   statements FDA has explicitly pre-authorized, it could easily have said so. But the

22   statute is much broader, prohibiting a state from establishing "any requirement ... that

23   is different from or in addition to, or ... otherwise not identical with" federal labeling

24   requirements. 21 U.S.C. § 379r(a). It says nothing about preapproval.

25       Second, the view is also unsupported by case law. The *Lemus* decision cites

26   only the Ninth Circuit's decision in *Astiana*. *Id*. at 4. But *Astiana* did not hold a claim

27   is preempted *only* if the FDA has explicitly authorized a statement—in that case, "All

28   Natural" or "Pure Natural." 783 F.3d at 756. It held the claims were not preempted

10

1    because "FDA ha[d] never issued regulations regarding the use of 'natural' on
2    cosmetics labels," leaving the plaintiff free to argue that the terms were "advertising
3    statements that *contradicted* the true ingredients listed on the FDA-mandated label."
4    *Id.* at 758 (emphasis added). Thus, *Astiana* means only that preemption may not apply
5    if the FDA has said nothing about the subject matter of the claims. *Goldstein*, 2022
6    WL 16540837, at *9 n.5 (distinguishing *Astiana*); *Bimont v. Unilever U.S., Inc.*, No.
7    14-CV-7749, 2015 WL 5256988, at *3–5 (S.D.N.Y. Sept. 9, 2015) (same).

8        Beyond that, many district courts in the Ninth Circuit and elsewhere (in
9    addition to *Goldstein* and *Amara*) have held that section 379r may preempt claims
10   despite the lack of any evidence the FDA explicitly authorized the challenged
11   statement. *See, e.g.*, *Robinson v. Walgreen Co.*, No. 20 C 50288, 2022 WL 204360, at
12   *4 (N.D. Ill. Jan. 24, 2022) (holding 379r preempted claim that term "infants" was
13   misleading because FDA had considered use by young children); *Youngblood v. CVS
14   Pharmacy*, No. 2:20-cv-06251-MCS, 2021 WL 3700256, at *3 (C.D. Cal. Aug. 17,
15   2021) (similar holding); *Harris v. Topco Assocs., LLC*, 538 F. Supp. 3d 826, 833
16   (N.D. Ill. 2021) (holding claim preempted because it "seeks to impose additional
17   obligations on Topco not imposed by the [monograph]"); *Faustino v. Alcon Lab'ys,
18   Inc.*, 2015 WL 12839161, at *2 (C.D. Cal. Sept. 22, 2015) (holding 379r preempted
19   claim that fell "squarely within the subject matter regulated by the FDA"), *aff'd* 692 F.
20   App'x 819 (9th Cir. 2017); *Wiltz v. Chattem, Inc.*, 2015 WL 3862368, at *2 (C.D. Cal.
21   May 8, 2015) (holding 379r preempted claim because "express federal regulation of
22   dental hygiene products ... does not encompass a finding that 'Rebuilds Tooth
23   Enamel' is misleading"); *Bimont*, 2015 WL 5256988, at *4 (rejecting argument that
24   preemption applies only to "areas that the FDA has already specifically regulated");
25   *Carter v. Novartis Consumer Health*, 582 F. Supp. 2d 1271, 1283 (C.D. Cal. 2008)
26   (holding 379r preempted claim regarding use of word "Toddlers").

27       This Court should reach the same result as in *Goldstein* and *Amara.* Describing
28   products with DXM as "non-drowsy" is entirely consistent with the FDA's

DEFENDANT PERRIGO COMPANY'S MOTION TO DISMISS

monograph and its conclusion that these are not products that "may cause drowsiness." Because Plaintiff's claims would impose requirements that the FDA considered and rejected, his claims are expressly preempted.

## II. Plaintiff has not pleaded facts sufficient to plausibly allege DXM causes drowsiness.

Even if express preemption did not apply, Plaintiff's claims would fail for lack of plausibility. A complaint must contain facts sufficient for a court to draw a "reasonable inference that the defendant is liable for the conduct alleged." *Iqbal*, 556 U.S. at 678. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* This requires plaintiffs to allege facts that, if true, would establish that a challenged statement is false or misleading; they cannot simply file lawsuits challenging a defendant to substantiate something it said. *See, e.g.*, *Kwan v. SanMedica Int'l*, 854 F.3d 1088, 1096 (9th Cir. 2017) (following *Nat'l Council Against Health Fraud, Inc. v. King Bio Pharm., Inc.*, 107 Cal. App. 4th 1336, 1344 (2003)). "[F]or claims that advertising lacks substantiation, the failure to allege specific facts pointing to actual falsehood constitutes a fatal flaw...." *Id.* at 1097.

Further, references to a few anecdotes, or inadequate or cherry-picked studies, are no better than speculation for this purpose. *See, e.g.*, *Aloudi v. Intramedic Rsch. Grp., LLC*, 729 F. App'x 514, 516–17 (9th Cir. 2017). In *Aloudi*, for example, the court held a plaintiff had not plausibly alleged facts showing "clinically proven" was false partly because he cited only one report without alleging he had "searched the available scientific literature in a comprehensive manner" before filing suit. *Id.* at 516. Similarly, while references to scientific studies certainly *may* help establish a plausible claim, that depends on the study. *See Tubbs v. AdvoCare Int'l, L.P.*, No. CV 17-4454 PSG, 2017 WL 11630768, at *4–5 (C.D. Cal. Dec. 12, 2017) (dismissing complaint that cited no relevant studies supporting allegations that claims about supplement were false); *Otto v. Abbott Laboratories, Inc.*, No. CV 12-1411-SVW, 2013 WL 12132064, at *3–7 (C.D. Cal. Mar. 15, 2013) (considering several cited studies and holding none

established plausibility of claim); *Eckler v. Wal-Mart Stores, Inc.*, No. 12-CV-727-LAB, 2012 WL 5382218, at *5–7 (S.D. Cal. Nov. 1, 2012) (noting it is not a premature "merits" argument to note that study does not show what plaintiff claims).

Here, Plaintiff cites only one study, now more than 25 years old, in support of his allegations that drowsiness is a common side effect of DXM. On its face, this study is not reliable. The hallmark of reliability, especially in studies purporting to test causation, is the use of a control group that receives a placebo. *See* Fed. Jud. Ctr., Ref. Manual on Sci. Evid. § 211, 2011 WL 7724256, at *4–8 (3d ed.) (discussing numerous examples). The Catena study did not use one. *See* Exh. B to Weissenberger Decl. at 95. The authors conceded this "might represent a limitation" of their results, but said they believed a placebo group was unnecessary because they were only comparing two drugs and the efficacy of both "ha[d] been previously demonstrated in double-blind, placebo-controlled trials." *Id.* That appears to be a reference to an "active control" design, meaning that unlike a placebo the control is also active in some way. *See* 21 C.F.R. § 314.126 (listing potential study designs). Even if that design was otherwise appropriate, the previous placebo-controlled trials involved *efficacy*, not drowsiness. This reasoning could not justify failing to use a placebo to test the latter.

But as the regulation shows and the FDA has itself explained in the context of antitussives, the use of an "active control" was *not* appropriate. *See* 44 Fed. Reg. 51512, 51522–23 (Aug. 31, 1979) (rejecting studies offered to support approval of Benylin). In fact, such a design is typically used only when using a placebo is impossible because it "would be contrary to the interest of the patient" (for example, a cancer patient in the placebo group of a chemotherapy test would get no treatment). 21 C.F.R. § 314.126(b)(2)(iv). And when causation is at issue, use of a placebo group is especially critical—which is why the FDA specifically stated that "**use of a placebo is necessary to assure the validity of studies of antitussive drugs**...." 44 Fed. Reg. at 51522 (emphasis added). This is partly because "[a] placebo control is needed to distinguish between a true pharmacological effect of the test drug and fortuitous

13

matters such as psychological effects of taking medication [*i.e.*, the "placebo effect"] or spontaneous improvement of the disease." *Id*. In a comparison study *without* a placebo control, "it is not known whether *either* of the drugs tested ... actually had a significant effect...." *Id*. at 51523 (emphasis added); *see also id*. at 51524 (rejecting two drowsiness studies *despite* use of placebo because of other problems that protocol used did not resolve). The Catena study had exactly that problem. On its face, it does not help make Plaintiff's claim plausible. *See Tubbs*, 2017 WL 11630768, at \*4–5; *Otto*, 2013 WL 12132064, at \*3–7; *Eckler*, 2012 WL 5382218, at \*5–7.

Plaintiff also alleges that the FDA adverse-event-report database "confirms" that drowsiness "is one of the most frequently-cited side effects" of DXM. Compl. ¶ 22. Perrigo does not believe the database actually shows that, but even if it did, it could not "confirm" or even support the point. As stated above, FDA itself points out that these reports are often duplicative, are not verified, and "cannot be used to estimate the incidence (occurrence rates) of the events reported." FDA Adverse Event Reporting System Public Dashboard (last visited Dec. 30, 2022). This lends no support to Plaintiff's claim.

The handful of other citations in Plaintiff's claim are similarly unpersuasive. The FAA document is unclear, and while it does suggest DXM may cause drowsiness, it also says "[m]ost cough medications are safe for flight, but caution for combination products with sedating antihistamines" (DXM is not an antihistamine). More importantly, the first page of the document shows that the FAA actually refers pilots to the FDA's Drug Facts panel for information about the potential risk of drowsiness. It should be interpreted consistently with the FDA's findings. Finally, Plaintiff cites two additional sources that are no more than brief references to "drowsiness" in connection with DXM, with no explanation or support. *See* Exh. C & D to Weissenberger Decl. This are no better than the internet posts rejected in *Tubbs*. If there were actual studies supporting those references, Plaintiff could have cited the studies instead. He did not.

Plaintiff's own anecdotal evidence is only speculation. Plaintiff claims that at some point after taking a recommended dose of the medication, he became "unexpectedly drowsy," and asserts that because there was "no other potential cause for this drowsiness," Perrigo's medicine must have been the cause. Compl. ¶ 38. This is conclusory, speculative, and inconsistent with common sense. The most obvious "other potential cause" for the drowsiness is the same illness for which Plaintiff was presumably taking the medication in the first place. In the absence of supporting facts, this also provides no reason to find Plaintiff's claim plausible. For that reason as well, the Court should dismiss the complaint.

## III.  Plaintiff's express-warranty claim fails because he failed to provide adequate presuit notice of his claim as the Commercial Code requires.

All sales contracts, including warranties, are governed by the Commerical Code, which requires a buyer to notify a seller of the alleged breach "or be barred from any remedy." Cal. Com. Code § 2607. The section requires a buyer to give notice within a "reasonable time" after the alleged breach, but courts have also interpreted the provision to require that notice be given in advance of filing suit. *See, e.g.*, *Alvarez v. Chevron Corp.*, 656 F.3d 925, 932 (9th Cir. 2011) (citing *Cardinal Health 301, Inc. v. Tyco Elecs. Corp.*, 169 Cal. App. 4th 116, 135 (2008)). Because "[t]he purpose of giving notice of breach is to allow the breaching party to cure the breach and thereby avoid the necessity of litigating the matter in court," some amount of presuit notice is required in order to make this a realistic possibility. *Alvarez*, 656 F.3d at 932. It follows that giving notice and filing "simultaneously" is insufficient (*id.*), but it similarly follows that presuit notice should be given early enough to allow some possibility for negotiation. Otherwise, the purpose would still be defeated.

Here, Plaintiff alleges he mailed notice to Perrigo on October 27, 2022. Compl. ¶ 54. (The letter is *dated* October 27, but was served on October 31.) Plaintiff filed suit four days later, on November 1. Even assuming Perrigo received this notice the same day it was mailed, four days should not be considered sufficient notice to fulfill

15

the requirement's purpose. Accordingly, the Court should dismiss Plaintiff's express-warranty claim.

**IV.    Plaintiff's claims for equitable relief should be dismissed because he has not alleged facts showing he would lack an adequate legal remedy.**

A plaintiff asserting claims for equitable relief must plead facts showing that he or she "lacks an adequate legal remedy." *Guzman v. Polaris Indus., Inc.*, 49 F.4th 1308, 1314 (9th Cir. 2022) (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020)); *see also Klaehn v. Cali Bamboo LLC*, No. 21-55738, 2022 WL 1830685, at *3 (9th Cir. June 3, 2022) (confirming that *Sonner* applies at the pleading stage). Claims for legal and equitable remedies can be alleged in the alternative, but both alternatives must be adequately pled. *See, e.g.*, *McKinney v. Corsair Gaming, Inc.*, No. 22-cv-00312-CRB, 2022 WL 2820097, at *10 (N.D. Cal. July 19, 2022).

First, Plaintiff's UCL, FAL, and unjust-enrichment claims are equitable in nature, and Plaintiff seeks equitable restitution as the remedy for each claim. Compl. ¶¶ 68, 77, 105. But Plaintiff does not even assert that he lacks an adequate remedy at law in the form of his claims for legal damages, much less allege facts that would support such an assertion. Without such facts, he has not stated a claim for restitution. *See, e.g., Guzman*, 49 F.4th at 1312; *Norman v. Gerber Prods. Co.*, No. 21-cv-09940-JSW, 2023 WL 122910, at *3 (N.D. Cal. Jan. 6, 2023); *Dutra v. J.R. Simplot Co.*, 2023 WL 113846, at *7–8 (E.D. Cal. Jan. 5, 2023).

Second, Plaintiff has not and cannot allege facts showing he might be entitled to prospective injunctive relief under the circumstances here. A claim seeking injunctive relief requires facts showing that injury is "actual and imminent, not conjectural or hypothetical. *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009). The threat of future injury must be "certainly impending." *Hanscom v. Reynolds Consumer Prod. LLC*, No. 21-CV-03434-JSW, 2022 WL 591466 (N.D. Cal. Jan. 21, 2022). The Ninth Circuit has held that "previously deceived consumers" may still have standing to seek injunctive relief, but only if they would be unable for some reason to verify whether

16

future labels are true or false. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018); *Martinez v. Mead Johnson & Co., LLC*, No. 5:22-cv-00213-JWH, 2022 WL 15053334, at *8 (C.D. Cal. Oct. 22, 2022). Here the complaint itself shows there is no threat of future injury at all.

Even if Plaintiff was misled by the term "nondrowsy" in the past, he cannot plausibly argue that would happen again because, according to him, he now knows that DXM causes drowsiness. Compl. ¶ 3. By law, the presence of DXM must be disclosed on the products' Drug Facts panel (Perrigo also discloses it on the front label). *Id.* ¶ 13; *see* Goodsense Label (Exh. A to Weissenberger Decl.). As this Court held in *Martinez*, Plaintiff "now knows where to look to dispel any confusion...." 2022 WL 15053334, at *8; *Stewart v. Kodiak Cakes, LLC*, 537 F. Supp. 3d 1103, 1127 (S.D. Cal. 2021) (holding plaintiff who could "cross-check" front label with back panel had no standing to seek injunctive relief). He faces no risk of future harm.

## CONCLUSION

For the foregoing reasons, the court should dismiss Plaintiff's complaint.

Dated: January 9, 2023

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Emily Weissenberger*
MICHAEL F. HEALY
M. KEVIN UNDERHILL
EMILY M. WEISSENBERGER

*Attorneys for Defendant*
PERRIGO COMPANY